## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| **GRACE FURR,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | **CIVIL ACTION** |
| **v.** ) | |
| ) | **No. 14-1011-KHV** |
| **RIDGEWOOD SURGERY AND** ) | |
| **ENDOSCOPY CENTER, LLC;** ) | |
| **NUETERRA HEALTHCARE** ) | |
| **MANAGEMENT, LLC and** ) | |
| **JOSEPH T. POGGI, III, M.D.,** ) | |
| ) | |
| **Defendants.** ) | |
| ————————————————) | |

### MEMORANDUM AND ORDER

Grace Furr brings claims against her former employer, Nueterra Healthcare Management, LLC ("Nueterra"); Ridgewood Surgery & Endoscopy Center, LLC ("Ridgewood") and Joseph T. Poggi, III., M.D. ("Dr. Poggi"). Under Title VII, 42 U.S.C § 2000e et seq., plaintiff alleges that Nueterra created a sexually hostile work environment, constructively discharged her based on sex and retaliated because she engaged in protected activity. This matter comes before the Court on Defendant Nueterra Healthcare Management, LLC's Motion For Summary Judgment (Doc. #80) filed March 4, 2015. For reasons set forth below, the Court finds that the motion should be sustained in part.[1]

_____

[1]    Under Kansas common law, plaintiff also alleges that Ridgewood and Dr. Poggi tortiously interfered with her employment contract with Nueterra. In a separate memorandum and order, the Court addresses the Motion For Summary Judgment (Doc. #82) which Ridgewood and Dr. Poggi filed on March 4, 2015.

## **Legal Standards**

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  See Fed. R. Civ. P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986); Hill v. Allstate Ins. Co., 479 F.3d 735, 740 (10th Cir. 2007).  A factual dispute is "material" only if it "might affect the outcome of the suit under the governing law."  Liberty Lobby, 477 U.S. at 248.  A "genuine" factual dispute requires more than a mere scintilla of evidence in support of a party's position.  Id. at 252.

The moving party bears the initial burden of showing the absence of any genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Nahno-Lopez v. Houser, 625 F.3d 1279, 1283 (10th Cir. 2010).  Once the moving party meets its burden, the burden shifts to the nonmoving party to demonstrate that genuine issues remain for trial as to those dispositive matters for which she carries the burden of proof.  Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990); see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986).  To carry her burden, the nonmoving party may not rest on her pleadings but must instead set forth specific facts supported by competent evidence.  Nahno-Lopez, 625 F.3d at 1283.

The Court views the record in the light most favorable to the nonmoving party.  Deepwater Invs., Ltd. v. Jackson Hole Ski Corp., 938 F.2d 1105, 1110 (10th Cir. 1991).  It may grant summary judgment if the nonmoving party's evidence is merely colorable or is not significantly probative.  Liberty Lobby, 477 U.S. at 250-51.  In response to a motion for summary judgment, a party cannot rely on ignorance of facts, on speculation or on suspicion, and may not escape summary judgment in the mere hope that something will turn up at trial.  Conaway v. Smith, 853 F.2d 789, 794 (10th

Cir. 1988).  The heart of the inquiry is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law."  Liberty Lobby, 477 U.S. at 251-52.

## Facts[2]

The following facts are either uncontroverted, deemed admitted or construed in the light most favorable to plaintiff, the non-movant.

Ridgewood is an ambulatory surgery center in Wichita, Kansas. Nueterra manages Ridgewood and employs all clinical and business staff for the facility.[3]  Nueterra does not employ the physicians who work at Ridgewood.  At all times relevant to this case, Nueterra and the physicians operated Ridgewood together and consulted with each other on a wide range of issues.

In March of 2007, Nueterra hired Grace Furr, a licensed registered nurse, as Clinical Administrator for Ridgewood.  In 2009, Furr also began to serve as Business Office Manager for Ridgewood.  Throughout her employment Furr also served as Ridgewood's Risk Manager. Nueterra Vice-President Kim Krause directly supervised Furr.  Furr's job duties included reporting allegations of sexual harassment to Krause and reporting incidents of physician misconduct to Nueterra.

Nueterra's retaliation policy applies to physicians and authorizes Nueterra to investigate and address complaints of retaliation by physicians.

The Development and Management Agreement ("Management Agreement") between

---

[2]     The Court disregards all legal arguments which the parties include in their statements of fact and responses to statements of fact.  See D. Kan. Rule 56.1.

[3]     Nueterra develops and manages ambulatory surgical centers throughout the United States.  Nueterra was instrumental in creating Ridgewood; it met with physicians about creating an outpatient surgical center and provided the documents to create and operate the facility, including the Operating Agreement and Medical Staff Bylaws.

Nueterra and Ridgewood governs Nueterra's duties as manager and provider of day-to-day operations at the facility.   Nueterra Holdings, LLC, a Nueterra entity which is separate from Nueterra and not a party to this lawsuit, is a minority owner of Ridgewood.  It holds one of five seats on the Board of Managers of Ridgewood. The Ridgewood Operating Agreement, which governs ownership of Ridgewood, provides that if a physician-member commits "gross misconduct," including "continued mistreatment of employees or staff at the Facility, which is not corrected upon notice from the Board of Managers," the physician-member may be required to sell his or her shares in Ridgewood.  Doc. #81-7, Operating Agreement, § 13.1.10.

Ridgewood Medical Staff Bylaws govern the credentialed physicians at Ridgewood, and establish a Credentialing Committee which also acts as the Continuous Quality Improvement Committee ("CQI Committee").  The Credentialing Committee has a duty to "investigate charges of misconduct by Medical Staff Members and Allied Health Professionals and make corrective action recommendations to the Governing Body."  Doc. #81-8, § 7.5.6.

Ridgewood has an employment policy of "nondiscrimination and equal opportunity for all employees and applicants."  Doc. #81-10 at 1.  Ridgewood Policies and Procedures also include an anti-harassment policy which provides as follows:

> The employer maintains a strict policy prohibiting sexual harassment.  This policy applies to all contractors and employees of the facility. Furthermore, it prohibits harassment in any form, including verbal, physical, and visual harassment. . . . Employees can be assured that there will be no retaliation against anyone who makes a complaint.

Id. at 3-4.

Nueterra provides Ridgewood employees a copy of the Ridgewood Employee Handbook. It includes an Equal Employment Opportunity policy which states that Ridgewood "does not discriminate on any prohibited basis, including race, color, sex, age, religion, national origin, or

disability." Doc. #81-11 at 4.  It also includes an anti-harassment policy that states that Ridgewood "prohibits sexual harassment and harassment because of race, color, national origin, ancestry, religion, creed, physical or mental disability, marital status, HIV-positive status, age, or any other basis protected by federal, state, or local law.  All such harassment is unlawful and will not be tolerated."  Id. at 6.

### 2011-12 Sexual Harassment Allegations And Investigation

On August 5, 2011, a staff member told Furr that another employee, nurse Lacey Henningson, had told her that Dr. Poggi had engaged in inappropriate sexual behavior.  In September of 2011, Furr reported to Nueterra Human Resources that Dr. Gaston had engaged in inappropriate sexual behavior with a nurse.  Human Resources interviewed Furr about both complaints.  At the direction of Nueterra HR, Furr prepared a detailed chronology of events that employees had reported to her.[4]  Nueterra then interviewed Nueterra employees – but not any physicians – concerning possible sexual harassment by physicians.  Nueterra determined that Ridgewood was an environment "at risk," so it referred the matter to Ridgewood to investigate allegations against the physicians. Doc. #93-1 at 38-41.

On December 5, 2011, Henningson informed Furr that Dr. Gaston was being rude to her and she thought other doctors had told Dr. Gaston that she had complained about his behavior.  Nueterra's HR team interviewed Henningson, who stated that she did not think that Dr. Gaston was retaliating.  A few days later, Dr. Gaston told Furr that "if [Henningson] has such a problem with me, then keep her out of my [operating] room."  Plaintiff's Ex. 16 at NUE 200.  Dr. Gaston said that

---

[4]     Nueterra's investigation indicated that Drs. Poggi and Gaston had engaged in inappropriate conduct of a sexual nature.  Although plaintiff has presented evidence of the details of that conduct, those details are not required for the Court to rule on the issues in this case.

the investigation would "force surgeons out of here and I will be the first to go."  <u>Id.</u>

On December 6, 2011, Nueterra provided sexual harassment training to nursing staff at Ridgewood.  No Ridgewood physicians attended.

On December 28, 2011, Dr. Hyder, Ridgewood Board Chairman, and Dr. Douglas Friesen, Ridgewood Medical Director and Chairperson of the Ridgewood Risk Management Committee, spoke to Dr. Gaston about the allegations of sexual harassment.  Dr. Gaston apologized and agreed to only engage in actions that were "appropriate and professional."  Doc. #81-15 at 2.

On January 3, 2012, Dr. Hyder, Dr. Friesen and two Nueterra representatives interviewed Dr. Poggi about the allegations against him.  Dr. Poggi apologized and promised to act in a professional manner in the future.  Dr. Poggi understood that the Board would monitor his behavior and that if he engaged in inappropriate conduct he would likely lose his privileges to operate at Ridgewood.  Although Nueterra recommended to Ridgewood that it require Dr. Poggi to obtain counseling at his own expense, Ridgewood did not implement that recommendation.

After the conversations with Drs. Poggi and Gaston, no one made further complaints of sexual harassment at Ridgewood while Furr worked there, and no one filed a Charge of Discrimination with the Equal Employment Opportunity Commission or the Kansas Human Rights Commission related to sexual harassment by Drs. Poggi or Gaston in 2011 or early 2012.

<u>Alleged Retaliation for Furr's Participation In Sexual Harassment Complaints</u>

Dr. Gaston had never treated Furr very well,[5] but after the sexual harassment investigation he treated her much worse.  Furr testified that he was very angry all the time.  Furr Depo. at 396.  Another employee observed that Dr. Gaston used a degrading tone of voice in speaking to Furr.

---

[5]      Furr testified that "the entire time I was there, I felt that he was – treated the other staff differently than what he did me."  Furr Depo. 343-44.

Dr. Poggi also treated Furr differently after the sexual harassment investigation.  Dr. Poggi had previously been cordial to Furr, but after the sexual harassment investigation he spoke to her in an angry tone on several occasions about the loss of a scrub tech.  Id. at 172-73.

Furr testified that many times, Dr. Gaston came into her office and yelled at her – sometimes when he was about one foot from her face.  Id. at 104.  Furr felt threatened when Dr. Gaston spoke to her about financial issues in a hateful and demeaning tone of voice.  Dr. Gaston told Furr, "I hate Nueterra, I want to fire them, and you're Nueterra."  Id. at 106.  In an apparent reference to Furr, Dr. Gaston referred to Medicare and Medicaid regulations to clinical staff as "Gracie's rules."  Id. at 111-12.

In May of 2012, Furr reported to Nueterra that Dr. Gaston was being hostile to her.  On August 29, 2012, Nueterra HR Manager Marilyn Dawson contacted Furr for a periodic "touchpoint call."  Dawson asked Furr about personnel issues at Ridgewood.  Doc. #81-18.  Furr told Dawson that Dr. Gaston had been "hostile" towards her "to the point where I could file on [him]."  Id.  Furr complained that Dr. Gaston "vetoed" Nueterra's decision to terminate an employee who was always late, and that Dr. Gaston often said that he "hates Nueterra's guts."  Id.  Furr confirmed that Dr. Gaston never called her a name or touched her.  Dawson's notes about the call state that "HR will study the history of complaints against physicians" and that an "RN involved in the hoopla last year went somewhere else."  Id.  Furr told Dawson that Dr. Gaston was rude to all employees.  Doc. #81-19 at 2.

On August 30, 2012, Krause spoke with Dawson, who recorded the following notes:

Dr. Gaston is one of the doctors who had his hands slapped for inappropriate behavior with the nurses and it continues to be a "burr" with him.  He does not think that HR handled it appropriately.  [Krause] stated that he personally thought HR handled it right.  The doctor has several things going on: nasty divorce, turned down

for employment with another hospital, Ridgewood having financial difficulties. He is grumpy and mad all the time with everyone. I have asked the Board Chair and Dr. Friesen (Medical Director) to get involved. They are looking at a merger and we want the merger to go through.

Doc. #81-18.[6]

On August 31, 2012, to ease the tension between Dr. Gaston and Furr, Dr. Friesen told Dr. Gaston not to speak to Furr without someone else present. Dr. Gaston complied, and did not have any further one-on-one conversations with Furr. Doc. #81-15.

On September 11, 2012, Dawson wrote an email to an official at Ridgewood about Furr's complaints about Dr. Gaston, and stated as follows:

I have spoken with [Nueterra General Vice President] who is aware of this situation and other concerns with the facility. They are currently merging with another partner who [the Nueterra General Vice President] believes will save the facility, and because of this does not want to address the issue until after the agreement goes through.

Doc. #83-2. That same day, Dawson also sent Cassandra Speier, Nueterra Senior Vice President, an email summarizing Furr's statement that she could "almost" file a claim of hostile environment. Dawson stated that "this is a very delicate situation with the merger that [Krause] explained must go through," and that Krause "asked that we leave it alone for now." Dawson further wrote as follows:

Because this is a Nueterra employee who reported to me the words "hostile work environment," I have a duty to act. . . . I do not think it is the right thing to do to sit on this. . . . [I will] circle back around [to see if Furr] no longer feels she is in this hostile environment.

Doc. #93-7. Dawson also stated that she had placed the insurance carrier on notice.

On September 13, 2012, Furr told Dawson that things were much better and that Dr. Gaston

---

[6]     Throughout 2012, the Ridgewood Board was discussing a possible merger with another ambulatory surgery center.

was avoiding her, which she assumed was because Dr. Friesen had spoken to him.  Dawson told Furr

to contact her if she had concerns about Dr. Gaston.

On September 26, 2012, Dr. Gaston sent an email to Krause and upper-management at

Nueterra, including Daniel Tasset, chairman of Nueterra Holdings.  The subject line of his email was

"Sinking."  Dr. Gaston expressed frustration with the slow process of the possible merger and other

concerns, as follows:

> This cash call was such an emergency yet Grace simply showed up to physician's
> offices with no explanation and wanted a signature. . . .  So in the middle of our crisis
> Grace takes a week of vacation.  Wow . . . . . REALLY!!!  That really looks like
> strong dedication on her part.  Physicians see this.  Employees see this!!  Employees
> are searching for jobs elsewhere because they are not getting full paychecks.  We
> have lost great employees!

Doc. #81-23 at 3.[7]

On September 27, 2012, Krause sent an email to David Ayers, CEO of Nueterra, which

stated in part as follows:

> Let me begin by saying that I do not concur with the majority of the items mentioned
> in [Gaston's] email. . . .  Our HR department, legal department and board of
> Managers had to advise him that his sexual approaches and comments to nurses were
> inappropriate within the walls of [Ridgewood].  He feels he has been humiliated on
> this subject and blames everyone else but himself for doing what he did.  He is upset
> because he is no longer the Chairman of the board and feels that Dr. Hyder and
> Olson should not hold seats on the board because of their low case volume.  Also,
> our administrator Grace Furr, is very close to filing a hostile work complaint against
> Dr. Gaston for serious verbal abuse.  Cassandra and HR are advised of this. There
> are also physicians and staff that have witnessed this behavior.

Plaintiff's Ex. 31 at NUE 1830.  Ayers forwarded Krause's email with comments to Tasset, Marc

Goff, Nueterra Chief Operating Officer, and Cassandra Speier, Nueterra Senior Vice President.

---

[7]       The same day that Dr. Gaston sent the "Sinking" email, Dr. Poggi replied to Dr.
Gaston's email and expressed that he too was a frustrated investor who was confused by
Ridgewood's performance and management.

Ayers did not address Furr's situation, but focused on the financial problems at Ridgewood and how to protect Nueterra's investment.  Tasset responded as follows:

> I'd like to see financials, etc. regarding this facility as well as projections.  Let's not be too anxious to exit this market.  I'd like to see us resolve their concerns and complaints FIRST and then go from there.

Id. at NUE 1829.  He did not express concern for Furr or address Dr. Gaston's behavior.

On October 1, 2012, Krause told Furr that someone had sent emails to management saying things about Furr that were not true, but that he had defended her.  He told Furr that he could not protect her and that he did not think the retaliation would stop.  He advised her that it would be best for her to quit her job.  Furr Depo. at 289-90.

On October 4, 2012, Dr. Poggi asked Furr if he could hire Lauren Slaughter, a scrub tech who had resigned in April of 2012, as his personal scrub tech.[8]  Dr. Poggi said that it was Furr's fault that Slaughter had quit, and asked Furr to come to her office so that he could speak to her privately.  Id. at 180.  Furr asked Dr. Poggi how he thought she was doing at Ridgewood.  Dr. Poggi told Furr that employees were leaving and that the operative experience was disintegrating.  Id. at 160, 165.  Dr. Poggi told Furr that she needed to do whatever she could to make Dr. Gaston happy.  Furr considered that instruction a personal attack because Dr. Poggi knew that Dr. Gaston had been demeaning to her.  Id. at 187-88.  Furr raised the 2011 sexual harassment issue, and Dr. Poggi told her to "find a way to get rid of" Valerie Beltz.  Id. at 185.  Furr inferred that Dr. Poggi was angry at Beltz for talking Henningson into reporting sexual harassment.  Id. at 183.  Dr. Poggi spoke in a

---

[8]    Dr. Poggi was frustrated because his case preference cards, which identify materials and tools which he preferred for surgeries, were not kept up to date.

very loud, angry voice throughout the 45-minute conversation.  Id. at 220-21.[9]  Furr testified that

the conversation with Dr. Poggi "just broke me . . . to where I'm like I just can't stay here anymore,

it was difficult."  Id. at 198-99.

On October 5, 2012, Furr sent an email to Krause, Marilyn Dawson, HR Vice President

Nikki Johnson, Speier, and U.S. Chief Operations Officer Marc Goff (all Nueterra employees).  She

stated that "I am left with no choice other than to file a formal complaint that I am in a very Hostile

work environment."  Doc. #81-24.[10]  She stated that she was considering looking for work elsewhere

and was having trouble sleeping at night.  Id.

Dawson contacted Furr shortly after Furr sent the email.  Furr told Dawson that the doctors

blamed her for Slaughter leaving.  She told Dawson that Slaughter "was [a good scrub tech] but I

also think [Dr. Poggi] thought he could continue to behave naughty with her."  Doc. #83-2 at 12.[11]

Furr told Dawson that she knew that Dr. Poggi would not speak to her the way he did if she were

a man.  Docs. #81-19; #81-25 at 18.  Furr told Dawson that Ridgewood was "in a terrible situation,"

that "not having money to pay vendors is a nightmare," it is "always tight and stressful" with

expenses, and that "the situation has created a fire storm."  Furr also stated that the doctors blamed

her and said that she should be "getting doctors in the door."  Doc. #81-25.

On October 8, 2012, Krause held a telephone conference call with Furr, Goff, Dawson,

---

[9]        Another Nueterra employee heard Dr. Poggi raise his voice many times during the closed-door meeting.

[10]        Furr testified that in this email she was "crying out" for Nueterra to protect her.  She sent the email because she felt that Dr. Poggi and Dr. Gaston were retaliating against her for her role in enforcing the sexual harassment policy.  Furr Depo. at 346.

[11]        Dawson testified that Furr said that Dr. Gaston had never been kind to her on any level.

Speier and Johnson.  Furr stated that she just wanted to find another job but was worried about the

90-day notice in her contract.  Doc. #83-2 at 14.  Krause stated that "[t]here has been a change in

Dr. Gaston in the last 9-12 months" and that "[Furr] has done a great job here." Id.

    After this telephone interview, Nueterra decided that it had a duty to investigate Furr's

complaint.  Although Krause had stated that physicians and staff had witnessed harassment of Furr,

Nueterra did not interview witnesses other than Furr.[12]  Goff testified that Nueterra did not follow

the same process in investigating Furr's complaints as it had with respect to the earlier sexual

harassment complaints.

    On October 8, 2012, the Ridgewood Board met with Furr.  Dr. Friesen said that he wanted

Furr to work at the surgery center sometimes when it was open on Saturdays and also work one day

per week in the "back," i.e. the surgery rooms.[13]  Furr Depo. at 227.  Dr. Friesen stated that this

_____

[12]    Furr testified that when she complained, she had hoped Nueterra would take steps
to protect her in the same way it protected the staff from sexual harassment, as follows:

> When I had a nurse come to tell me that she was being sexually harassed, I
> immediately told my boss, Kim Krause, and he said that he was going to be talking
> to HR and to, I guess, his superior.  And HR did a full – they did an investigation,
> they talked to employees, and they asked me questions.  Wyatt Wright was involved,
> he came to a board meeting.  I think there were meetings with – between physicians
> that I was not part of and nor was I a part of the meetings or the discussions with the
> employees.  They were one on one with them. . . . It seemed to me that they had done
> quite a lot to address the situation.

Furr Depo. at 394-95.

[13]    On November 8, 2012, Dr. Friesen sent Krause an email in which he asserted that he
did not know about Furr's complaint until days after the October 8 meeting, as follows:

> I believe somewhere in our minutes [it] should be noted that the "official date" of the
> HR letter which was presented to me was on October 10 (via email from you).  I
> know it was written on the 4th, however, I did not become aware of its' [sic] contents
> until the 10th.  This I believe should circumvent any perception of retaliation

(continued...)

-12-

would be cost-effective and improve employee morale.[14]  Furr expressed concern that she did not

feel confident providing patient care.  Dr. Gaston responded that based on more than 20 years of

nursing experience, she could easily regain her patient-care skills.

Shortly after the board meeting on October 8, 2012, Krause told Furr that she did not need

to work on Saturdays or work in the back.  Furr never worked on Saturday after that meeting.

On October 10, 2012, Krause forwarded Furr's email of October 5th to Dr. Friesen.  He told

Dr. Friesen to keep it confidential and to "make sure there is no retaliation."  Doc. #81-30.

On October 12, 2012, Dr. Gaston wrote to Nueterra's CEO Ayers.  He stated that Furr took

anything physicians said "as verbal harassment."  Doc. #93-34.  He blamed Furr for employees

looking for work elsewhere.  He criticized Krause as lacking "the ability to move us along and pull

us out of our problems."  Id.  The email concluded, "[w]e need a change."  Id.  On October 15, 2012,

Ayers forwarded Dr. Gaston's email to Goff, Speier and Krause.  He stated as follows:

> Marc, this situation isn't improving according to Dr. Gaston.  I know there are many
> moving parts, and as many perceptions as there are people involved, but we need to
> bring this to a head.  I don't think our administrator is seeing clearly at this point, and
> I'm also sure we have a group of dysfunctional physicians.  Please meet with your
> team and let me know how you wish to proceed.

Id.

---

[13](...continued)
regarding the issues I presented about nurse manager in our Board meeting on the
8th.

Doc. #81-29.  In a later affidavit, however, Dr. Friesen stated that he learned about Furr's complaint
on October 8, 2012 *after* the board meeting.  He stated that Krause told him that Furr had written
an email complaining about Dr. Poggi to Nueterra HR and management, and that he would send the
email to Dr. Friesen later.

[14]     Although Furr often came to the surgery center on Saturday mornings, she had never
worked a full Saturday at Ridgewood.

Dr. Friesen testified that in response to Furr's complaint of October 5, the CQI committee met to discuss the issues which she raised.  He testified that the committee decided that Drs. Hyder and Friesen would meet with Dr. Poggi to discuss Furr's email and that Drs. Francis Abraham and Reena Patel would meet with Furr.

When Drs. Friesen and Hyder met with Dr. Poggi, he expressed surprise at Furr's allegations and stated that he thought that on October 5, he had had a constructive conversation with Furr about his concerns about the operating room experience and the facility management.

On October 17, 2012, Drs. Patel and Abraham spoke with Furr.  They told her that they supported her, that they thought she had done a good job and that they did not want her to quit.[15]

On October 18, 2012, Dr. Poggi sent an email to Dr. Friesen about Furr's allegation that he was harassing and retaliating against her, as follows:

> This is ridiculous.  It is crazy to expect me to keep working at Ridgewood.  Crazy.  What assurance do I have to protect ME? . . . I WILL pull all my cases to protect myself if I do not hear about the conclusion of this by next Friday.

Doc. #83-1 at 19.  Dr. Poggi asked Dr. Friesen to forward the email to Krause and others.  Id.

On October 30, 2012, the CQI Committee sent recommendations to the Ridgewood Board of Managers, stating that "to resolve this matter, [] both parties need to be addressed."  Id. at 20.  The committee recommended that physicians address any issues with Furr only with another physician present or that the physician bring the issue to the Chairman of the Board or Medical Director.  It also recommended that Nueterra give Furr coaching to improve her management and

---

[15]      Furr told Drs. Patel and Abraham that in her discussions with Krause, there was a concern that she could not keep up with the surgery center's financial situation if she was also working in the clinical area of the surgery center.  Furr Depo. at 205-06.

conflict resolution skills.[16]

Dr. Friesen gave Krause and Speier a copy of the recommendations.  Krause and Speier told Dr. Friesen that Nueterra did not believe that Ridgewood's recommendations regarding Furr were appropriate.  Nueterra did not require Furr to undergo any kind of training or education based on the CQI Committee recommendation.  Goff Depo. at 229.

On November 1, Dawson contacted Furr and Furr told her "it is calm now."  Furr questioned the plan that any physician with concerns about her go through Dr. Friesen.  She stated, "I feel as though Dr. Friesen is buddy with them and if I said anything to Dr. Gaston that Dr. Friesen would be in my face" and that she was "[a]lways in fear of repercussion from Dr. Friesen."  Plaintiff's Ex. 16 at NUE 138.

On December 7, 2012, Dawson asked Furr how she was doing, and Furr responded that she was "okay."  She did not raise any concerns about her work environment.  No one at Nueterra ever told Furr that he or she was upset because she reported concerns about the meeting with Dr. Poggi on October 4, 2012.  Furr Depo. at 304, 383.

Furr's Job Search And Resignation

Within a few weeks after Furr's complaint of October 5, 2012, Krause suggested that she apply for a clinical position at Nueterra headquarters in Leawood, Kansas.  Furr Depo. at 243-44.[17] Shortly after that, Krause told Furr that he did not think Drs. Gaston and Poggi were going to leave her alone, and that it would be best if she found employment elsewhere.  He told her that "they're

---

[16]     The CQI Committee did not recommend that Dr. Gaston or Dr. Poggi receive any re-education.

[17]     Furr applied for that position on November 6, 2012.  As of early December, she had not received any response from Nueterra regarding her application.

wanting you to quit." Krause told Furr that he did not think that the retaliation would stop. He said that he did not think that he could protect her and that he did not want to get fired while trying to protect her. He told her that he would give her an excellent reference.[18] Furr began searching for another job.   In early December of 2012, Wichita Surgical Specialists ("WSS") offered plaintiff a job. Furr Depo. at 244, 248. Furr testified that she had a choice between staying or leaving, and that she made the choice to leave. Furr waited until WSS had offered her a job before she resigned from Nueterra.

Furr's employment agreement required her to give Nueterra 90 days' notice of her resignation or pay Nueterra 90 days salary. Krause told Furr that she could give six weeks notice, and on December 10, 2012, Furr gave Nueterra a six-week notice of resignation. Some time after that, Krause went to Furr's office, put a General Release Agreement on Furr's desk, threw his hands up and said "they want me to give you this." Furr Depo. at 44-45; Plaintiff's Ex. 20. The release stated that Furr owed Nueterra money for not giving 90 days' notice and proposed that Furr release all claims in exchange for forgiveness of her debt. Furr did not sign the release.

On January 18, 2013, Furr worked her final day for Nueterra. In her exit interview, Furr stated that she was resigning because she believed it was a "spiritual battle" and she was "being called to move on from this center." Furr Depo. at 239-40; Doc. #81-37. On an exit questionare, Furr answered "yes" to questions (1) whether she would recommend Nueterra to her friends as a good place to work, (2) whether Nueterra treated her like a valuable member of the company, (3) whether Nueterra is a great company. She also answered that she was "very satisfied" that

---

[18]     Furr never spoke to Krause's supervisor or anyone else in Nueterra HR about Krause's statements to confirm his opinion or request that they help her. Furr. Depo at 380-81.

"employee problems and complaints were resolved fairly and promptly." Doc. #81-37. Nueterra hired Kim Jennings, a woman, to replace Furr.[19]

Furr believes that Dr. Poggi and Dr. Gaston would have treated her differently if she were a man because the prior allegations of sexual harassment showed that the doctors had no respect for women in general, and because Dr. Poggi had previously told her that she was "too nice."

Other than training the doctors, Furr does not know exactly what Nueterra should have done to help her. She testified, however, that "I believe that I cried out on that e-mail in hopes that they would help me, that's why I sent that e-mail." Furr Depo. at 345. She further testified as follows:

> I felt like they would have had a plan or they would have had some way of trying to work though these kinds of things. And I just felt like that didn't happen.

Id. at 349. She testified that Nueterra did a full investigation of the sexual harassment complaints in 2011, but did not fully investigate her complaint. Id. at 393-96.

Furr's Job Performance

Throughout Furr's employment with Nueterra, Krause was Furr's direct supervisor and evaluated her job performance. On Furr's evaluation for 2010, Krause wrote that "Grace did a tremendous job in managing the center in 2010. She always gave 100% in all duties performed. She did an excellent job in managing a very tight budget." Doc. # 93-14 at 4. On Furr's evaluation for 2011, Krause stated that Furr exceeds expectations. In October of 2012, Krause noted that Furr had done a great job.

Furr's Charge of Discrimination

On May 6, 2013, Furr filed a Charge of Discrimination with the Equal Employment

---

[19]     Jennings's replacement, Anne Mengelkoch, is also a woman.

-17-

Opportunity Commission.[20]  She checked the boxes for discrimination based on sex and retaliation from October 3, 2012 through January 18, 2013.  Doc. #81-38.  In the narrative portion of the charge, Furr stated "I felt compelled to quit my employment because of retaliation for my role in bringing to light the sexual harassment complaints of an employee."  Id. at 2.  She stated that Dr. Poggi almost immediately started retaliating against her.  Id.  Furr also described two specific incidents: Dr. Poggi yelling at her on October 3, 2012 (which actually occurred on October 4) and being "confronted" by board-member physicians a week later in regard to an expansion of her job duties.  Id.  Furr did not check the "continuing action" box on the charge.[21]  Id.

On December 16, 2013, Furr filed this action in the District Court of Sedgwick County, Kansas.  On January 8, 2014, Nueterra filed a notice of removal to this Court.  Doc. #1.

### Analysis

Nueterra asserts that it is entitled to summary judgment on plaintiff's Title VII claims of sexual harassment because (1) Furr failed to exhaust administrative remedies, (2) she did not properly plead sexual harassment, (3) she has not set forth evidence to support a prima facie case of sexual harassment and (4) Nueterra is not liable for any harassment by Ridgewood or Dr. Poggi.  Nueterra asserts that it is entitled to summary judgment on plaintiff's Title VII claim of retaliatory harassment because (1) Furr has not set forth evidence to establish a prima facie case and (2) Nueterra is not liable for retaliation by Ridgewood.  Nueterra asserts that it is entitled to summary judgment on plaintiff's Title VII claims of constructive discharge based on sex and retaliation because Furr has not set forth evidence to support a prima facie case.

---

[20]    On May 8, 2013, Furr filed a Charge of Discrimination with the Kansas Human Rights Commission.

[21]    Counsel represented Furr when she filed her charge.

## I.    Sexual Harassment

Nueterra argues that Furr did not plead a claim of sexual harassment and never sought to file an amended complaint.

Plaintiff's state court petition alleges that Nueterra violated Title VII by "retaliating against Furr for engaging in protected activity."  The petition claims that Nueterra retaliated against Furr for her "role in bringing to light the sexual harassment complaints of [another] employee."  Doc. #1-1 ¶ 16.  It does not allege that Nueterra or any other defendants subjected her to sexual harassment.

The Pretrial Order (Doc. #78) filed February 13, 2015, supersedes all pleadings and controls the subsequent course of the case.  See Fed. R. Civ. P. 16(d); D. Kan. Rule 16.2(b).  In the pretrial order, plaintiff asserts that Nueterra subjected her "to a hostile work environment in violation of Title VII's anti-retaliation and anti-discrimination provisions (based on her gender)."  Doc. #78 at 7.[22]  When a claim appears for the first time in a pretrial order, the Tenth Circuit has directed as follows:

> [i]t is incumbent upon opposing counsel to meticulously examine the order, taking exception, if necessary, to the additions, and recording their objection in the pretrial order.  Meanwhile, the party seeking to add a claim or defense should do so with specificity and clarity so as to minimize the ill effects of that practice.  Specificity and clarity provide the trial court with a fair opportunity to consider whether to approve or deny what is obviously an attempt to amend the pleadings at a rather late date.

Wilson v. Muckala, 303 F.3d 1207, 1216 (10th Cir. 2002).  Here, Nueterra objected to inclusion of the sexual harassment claim, stating that "it was not properly raised in Plaintiff's Charge of

---

[22]    Plaintiff has not responded to Nueterra's argument that her petition did not allege sexual harassment and Nueterra asserts that plaintiff has therefore abandoned her sexual harassment claim.  Plaintiff responded, however, to Nueterra's arguments that she did not exhaust her administrative remedies or set forth a prima face case of sexual harassment.  Thus it appears that plaintiff did not intend to abandon her sexual harassment claim.

Discrimination and Petition," and that plaintiff "failed to timely amend the pleadings to add this claim within the Scheduling Order, and should not be permitted to do so now." Plaintiff does not assert any reason why the Court should allow her to add a claim for a hostile work environment based on sex. Furthermore, even if the Court did allow the claim, Nueterra is entitled to summary judgment because plaintiff failed to exhaust administrative remedies on this claim.

Under Title VII, a charge of discrimination with the EEOC or designated state agency is a jurisdictional prerequisite to suit based on a claim of employment discrimination. See Apsley v. Boeing Co., 691 F.3d 1184, 1210 (10th Cir. 2012); Sizova v. Nat'l Inst. of Standards & Tech., 282 F.3d 1320, 1324-26 (10th Cir. 2002); Alcivar v. Wynne, 268 F. App'x 749, 753 (10th Cir. 2008) (citing Shikles v. Sprint/United Mgmt. Co., 426 F.3d 1304, 1317 (10th Cir. 2005)). Without such a filing, federal courts lack subject matter jurisdiction. See Carmody v. SCI Colo. Funeral Servs., Inc., 76 F. Supp.2d 1101, 1103-04 (D. Colo. 1999). Because exhaustion of administrative remedies is a prerequisite to subject matter jurisdiction, plaintiff bears the burden of showing exhaustion. McBride v. CITGO Petrol. Corp., 281 F.3d 1099, 1106 (10th Cir. 2002).

To exhaust administrative remedies, plaintiff generally must present her claim to the EEOC or authorized state agency and receive a right to sue letter based on that charge. The charge "shall be in writing and signed and shall be verified." 29 C.F.R. § 1601.9. At a minimum, it must identify the parties and "describe generally the action or practices complained of." 29 C.F.R. § 1601.12(b). The charge tells the EEOC or KHRC what to investigate, provides an opportunity to conciliate the claim and gives the charged party notice of the alleged violation. Martinez v. Potter, 347 F.3d 1208, 1211 (10th Cir. 2003).

A plaintiff's claim in federal court is generally limited by the scope of the administrative investigation that can reasonably be expected to follow the charge of discrimination. MacKenzie

-20-

v. City & Cty. of Denver, 414 F.3d 1266, 1274 (10th Cir. 2005).  In determining whether plaintiff has exhausted administrative remedies as to a particular claim, courts liberally construe administrative charges.  Jones v. U.P.S., Inc., 502 F.3d 1176, 1186 (10th Cir. 2007); see Mitchell v. City & Cty. of Denver, 112 F. App'x 662, 667 (10th Cir. 2005) (more lenient pleading standard acknowledges that administrative charges of unlawful employment practices are regularly filled out by employees without counsel).  The charge, however, must contain facts concerning the discriminatory actions underlying each claim.  Jones, 502 F.3d at 1186.  Each discrete incident of alleged discrimination or retaliation constitutes an "unlawful employment practice" for which plaintiff must exhaust.  Id.

Plaintiff's failure to check the appropriate box on the administrative charge form for the type of discrimination alleged creates a presumption that she does not assert claims represented by boxes not checked.  See Gunnell v. Utah Valley State Coll., 152 F.3d 1253, 1260 (10th Cir. 1998).  Plaintiff may rebut this assumption with the text of the claim in the narrative section of the charge form.  See id. (citing Kristufek v. Hussmann Foodservice Co., 985 F.2d 364, 368 (7th Cir. 1993)).  Although sparse, an allegation may be sufficient to satisfy the statutory requirements of exhaustion and fulfill the purposes of notice to the employer and an opportunity to conciliate the claim.  See id. (allegation sufficient if it identifies type of discrimination complained of, identity of  alleged harasser and approximate time period).

Plaintiff did not check the box which indicates that the alleged illegal conduct was part of a "continuing action."  In the sworn statement attached to her Charge and Petition, Furr describes only two incidents of alleged retaliation or discrimination: being "yelled" at by Dr. Poggi on October 4, 2012, and being "confronted" by board-member physicians a week later regarding a proposed expansion of her job duties.  Doc. #1-1, ¶¶ 1, 19.  Furr does not allege that either event was

based on sex.

The Court agrees that nothing in the EEOC form put Nueterra on notice of a claim of sexual harassment.  See Apsley, 691 F.3d at 1210 (charge must put defendant on notice of claims; although plaintiff checked box for retaliation, narrative did not give notice that plaintiff claimed retaliation relating to gender, race or disability).  Plaintiff has not exhausted administrative remedies on her Title VII claim for sexual harassment, and the Court therefore lacks subject matter jurisdiction over this claim.[23]

## II.      Constructive Discharge Based On Sex

Plaintiff asserts a claim for constructive discharge based on sex in violation of Title VII.  To establish a prima facie case of sex discrimination under Title VII, plaintiff must show that (1) she is a member of a protected class; (2) she suffered adverse employment action; and (3) the action took place in circumstances which give rise to an inference of discrimination.  Plaintiff is a female and thus satisfies the first element.  As to the second and third elements, Nueterra argues that it is entitled to summary judgment because plaintiff cannot show adverse employment action and cannot show that any such action occurred under circumstances which give rise to an inference of discrimination.

A Title VII plaintiff who advances a constructive discharge claim premised on a hostile work environment "must show working conditions so intolerable that a reasonable person would have felt compelled to resign."  Montes v. Vail Clinic, Inc., 497 F.3d 1160, 1174 n.19 (10th Cir. 2007) (quoting Penn. State Police v. Suders, 542 U.S. 129, 147 (2004)); see Exum v. U.S. Olympic

---

[23]      Even if it reached the merits of plaintiff's sexual harassment claim, the Court finds that for substantially the reasons set forth in Nueterra's memoranda, she has not produced sufficient evidence to set out a prima facie case of sexual harassment.

Comm., 389 F.3d 1130, 1135 (10th Cir. 2004) ("Working conditions must be so severe that the plaintiff simply had no choice but to quit"). The Court applies an objective test under which neither the employee's subjective views of the situation, nor the employer's subjective intent, are relevant. EEOC v. PVNF, LLC, 487 F.3d 790, 805 (10th Cir. 2007). Plaintiff's burden in a constructive discharge case is substantial because plaintiff must show that the working conditions imposed by the employer were not only tangible and adverse, but intolerable. Id. "The question is not whether the employee's resignation resulted from the employer's actions, but whether the employee had any other reasonable choice but to resign in light of those actions." Tran v. Trs Of State Colls., 355 F.3d 1263, 1270 (10th Cir. 2004).

In support of her constructive discharge sex discrimination claim, plaintiff relies on the same facts as those underlying her claim of retaliation for engaging in protected activity. Nueterra argues that if plaintiff has established the second element – that working conditions were so severe that she had no choice but to quit – she has not shown circumstances which give rise to an inference of discrimination based on gender. The Court agrees.

Nueterra points out that Furr has no evidence that she was treated less favorably than any similarly situated man; Furr correctly responds that she need not do so. See Plotke v. White, 405 F.3d 1092, 1099 (10th Cir. 2005) (variety of circumstances can give rise to inference of discriminatory motive including actions or remarks made by decisionmakers that could be viewed as reflecting discriminatory animus and preferential treatment to employees outside protected class). Furr asserts that evidence of past sexual harassment by Drs. Poggi and Gaston, including physical touching of a sexual nature, would allow a jury to infer that Nueterra's conduct was because of Furr's sex. Plaintiff does not cite any cases in support of this assertion. Rather, she asserts that a jury could infer that the conduct of Drs. Poggi and Gaston's in "forcing her out of Ridgewood []

-23-

came at least in part from the same lack of respect for Furr as a woman in a position of authority as did their sexual harassment of women." Doc. #88 at 57. Standing alone, such conduct is not sufficient to give rise to an inference of discrimination based on gender. Moreover, Nueterra notes that it replaced Furr with a woman. The Court finds that Furr has not presented a prima facie case of gender discrimination. Nueterra is therefore entitled to summary judgment on plaintiff's claim of constructive discharge sex discrimination.

### III.    Retaliation Claims

To establish a prima facie case of retaliation, plaintiff must show (1) that she engaged in protected opposition to discrimination, (2) a materially adverse action and (3) a causal nexus between plaintiff's opposition and defendant's conduct. Somoza v. Univ. of Denver, 513 F.3d 1206, 1211-12 (10th Cir. 2008); Turrentine v. UPS, Inc., 645 F. Supp.2d 976, 986 (D. Kan. 2009).

Here, Furr claims that Nueterra retaliated against her with two related types of materially adverse actions: (1) it subjected her to a hostile work environment and (2) it constructively discharged her.

A.    Retaliatory Harassment

1.    Protected Opposition

Protected activities under Title VII fall under two categories: participation and opposition. 42 U.S.C. § 2000e-3; Vaughn v. Villa, 537 F.3d 1147, 1151 (10th Cir. 2008). Furr relies on the "opposition clause," which prohibits an employer from retaliating against an employee who communicates her belief that the employer has discriminated. Crawford v. Metro. Gov't, 555 U.S. 271, 276 (2009).

Plaintiff asserts that she engaged in protected opposition beginning in September of 2011 when she first reported to Nueterra HR that staff members had complained about sexual harassment

by Drs. Poggi and Gaston.  Nueterra argues that plaintiff did not engage in any protected conduct before October 5, 2012, when she sent Nueterra an email which complained that she was being subjected to a hostile work environment and referred to the "human resources nightmare" and sexual harassment complaints by employees in 2011.  Nueterra asserts that plaintiff's actions in reporting the complaints of others did not constitute protected opposition, because she did so in her role as manager.  The Court disagrees.

Under the "manager rule," if an employee is required as part of her job duties to report or investigate other employees' complaints of discrimination, such reporting or investigating by itself is not a protected activity under the opposition clause because merely to convey others' complaints of discrimination is not to oppose unlawful practices.  See McKenzie v. Renberg's Inc., 94 F.3d 1478, 1486-87 (10th Cir. 1996) (personnel director who reported concerns about possible FLSA violations not engaged in protected opposition).  To engage in protected opposition, the employee must instead "step outside . . . her role of representing the company and either file (or threaten to file) an action adverse to the employer, actively assist other employees in asserting Title VII rights, or otherwise engage in activities that reasonably could be perceived as directed towards the assertion of rights protected by [Title VII]."  Weeks v. Kansas, 503 Fed. Appx. 640, 642 (10th Cir. 2012) (in-house lawyer must do more than merely act within scope of duties as general counsel).

Plaintiff points out that after the Tenth Circuit opinion in McKenzie, the United States Supreme Court suggested that "'all one has to do to oppose an unlawful employment practice in Title VII cases is to "to resist or antagonize . . . ; to contend against; to confront; resist; [or] withstand" it.  Crawford v. Metro. Gov't of Nashville & Davidson Cty., 555 U.S. 271, 276 (2009) (further quotations omitted).  The Tenth Circuit has commented that "[w]hether and how this general standard meshes with McKenzie" is unclear.  Weeks, 503 F. App'x at 643.  Moreover, "courts have

-25-

generally applied [the] rule only to managers in human resources departments or those with specific duties related to investigating personnel issues, not to managers in other areas." Howe v. Sears, Roebuck & Co., 990 F. Supp. 2d 913, 921 (W.D. Wis. 2014). Recently, the Second Circuit held that if an employee – even one whose job responsibilities involve investigating complaints of discrimination – actively "supports" other employees in asserting their Title VII rights or personally "complains" or is "critical" about the "discriminatory employment practices" of her employer, that employee has engaged in a protected activity under the opposition clause. Littlejohn v. City of New York, 795 F.3d 297, 317 (2d Cir. 2015). Further, since Crawford, the Fourth and Sixth Circuits have rejected the "manager rule" in Title VII retaliation claims. See DeMasters v. Carilion Clinic, 796 F.3d 409, 424 (4th Cir. 2015) (applying "manager rule" in Title VII context would discourage human resource employees from voicing concerns about workplace discrimination and put in motion downward spiral of Title VII enforcement); Johnson v. Univ. of Cincinnati, 215 F.3d 561, 579-80 (6th Cir. 2000) (only qualification on protection from retaliation under Title VII opposition clause is that manner of opposition be reasonable). Other circuits, however, continue to apply the manager rule. See Brush v. Sears Holdings Corp, 466 F. App'x 781, 787 (11th Cir. 2012) (Crawford applied only where reporting of harassment claim solicited rather than volunteered; Crawford did not foreclose "manager rule"). The Tenth Circuit has not directly addressed the impact of Crawford on the manager rule.

In this case, plaintiff was not an HR manager. Further, she did not simply record the complaints of others and forward them to HR. For example, on December 5, 2011, she told her employer that Dr. Gaston had badly treated an employee who reported sexual harassment, stated that "this is definitely retaliation" and reported that the employee was really upset, "and rightly so." The record reflects that plaintiff actively supported other employees who had reported discrimination and

was critical of discriminatory practices at Ridgewood.  Thus, the Court finds a genuine issue of disputed material fact whether plaintiff engaged in protected opposition.

On August 29, 2012, Furr complained to Nueterra HR Manager Dawson about  a "hostile work environment" at Ridgewood.  Nueterra argues that Furr did not indicate that she was complaining about a Title VII violation, noting that Furr did not refer to any protected classification, and that she confirmed that Dr. Gaston had never "called her a name or touched her."  See Rangel v. Sanofi Aventis U.S., LLC, 507 F. App'x 786, 791 (10th Cir. 2013) (to qualify as protected opposition, employee must convey to employer concern that employer has engaged in unlawful practice; vague reference to discrimination and harassment without indication that misconduct was motivated by unlawful factor not protected activity).  In context, however, Dawson knew of Furr's prior involvement in reports of sexual harassment at Ridgewood and Furr's prior complaints of a hostile work environment; thus Furr's reference to a hostile work environment in the phone call on August 29 could be seen as a complaint about retaliation.

Plaintiff also asserts that she engaged in protected opposition on October 5, 2012, when she sent Krause an email complaining of harassment, and referring to the sexual harassment complaints by employees in 2011.  As noted, defendant does not contest that plaintiff engaged in protected activity on October 5, 2012, and the Court finds that the October 5, 2012 email constitutes protected activity.

2.    Materially Adverse Action

As a preliminary matter, the parties disagree as to what constitutes a materially adverse action in a claim for retaliatory harassment.  Nueterra cites McGowan v. City of Eufala, 472 F.3d 736, 743 (10th Cir. 2006), for the proposition that to make out a retaliation claim based on a hostile work environment, "a Title VII plaintiff must present evidence that "the workplace [was] .

. . permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."  After <u>McGowan,</u> however, the United States Supreme Court held that instead of showing an action that affected the terms and conditions of employment, a retaliation plaintiff need only meet a lower standard - that the challenged action was materially adverse, <u>i.e.</u> that it might have dissuaded a reasonable worker from making or supporting a charge of discrimination.  <u>See Burlington N. Santa Fe Ry Co. v. White</u>, 548 U.S. 53, 68 (2006).

In <u>Turrentine v. UPS, Inc.</u>, 645 F. Supp.2d 976, 986 (D. Kan. 2009), the Honorable John W. Lungstrum found that a plaintiff claiming retaliatory harassment need not show harassment that is severe or pervasive, but must only show that the challenged conduct might dissuade a reasonable person from pursuing a charge.  <u>See</u> <u>Haney v. Preston</u>, No. 08-2658 JAR/GLR, 2010 WL 5392670, at *12 (Dec. 22, 2010) (adopting approach in <u>Turrentine</u>).[24]  The Court agrees that plaintiff need only show that the alleged conduct might dissuade a reasonable person from pursing a charge.

Furr cites a series of  events after the sexual harassment investigation in late fall of 2011.

---

[24]     Nueterra notes that in <u>Lounds v. Lincare</u>, the Honorable Richard D. Rogers quoted <u>McGowan</u> for the proposition that "to succeed on a retaliation claim based on a hostile work environment, a Title VII plaintiff must present evidence that "the workplace [was] . . . permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."  <u>Lounds</u>, No. 13-1091-RDR, 2014 WL 3361751, at *14 (D. Kan. July 9, 2014) (quoting <u>McGowan</u>, 472 F.3d at 743.

On appeal, the Tenth Circuit reversed the district court grant of summary judgment on plaintiff's hostile work environment claim of race discrimination, and affirmed the grant of summary judgment on the retaliation claim.  <u>Lounds v. Lincare</u>, 812 F.3d 1208 (10th Cir. 2015).  The  Tenth Circuit did not analyze the retaliation claim as a hostile work environment claim, but found that even if plaintiff had set forth a prima facie case, she did not produce any evidence that defendant's proffered reasons for discipline and termination were a pretext for retaliation.  <u>Id.</u> at 1236-37.  Therefore it did not directly address whether the "severe or pervasive" standard applied to a hostile work environment retaliation claim.  <u>Lounds</u> is not controlling in this case.

She asserts that these event establish retaliatory harassment as a materially adverse action, including (1) in December of 2011, Dr. Gaston told plaintiff to keep an employee who had complained of sexual harassment out of his operating room, and stated that the investigation would force surgeons out and that he would be the "first to go;" (2) Dr. Gaston treated plaintiff differently than before, speaking to her loudly with a demeaning tone; (3) Dr. Gaston came into plaintiff's office many times and yelled at her, and stated that he hated Nueterra and that she was Nueterra and (4) Dr. Poggi spoke to plaintiff with an angry tone.

Plaintiff also cites additional events that occurred after August 29, 2012, when she told Nueterra's HR that one physician had been so hostile that she could file a complaint, including the following: (1) Dr. Poggi yelled at her and told her that she needed to get rid of an employee who had encouraged another employee to report sexual harassment; (2) Ridgewood asked her to work a Saturday every other month and in the clinical area of the surgery center one day per week; (3) Krause told her that the doctors would not stop retaliating and that she should find another job and (4) Nueterra asked her to sign a release of her claims in exchange for Nueterra not enforcing her agreement to provide 90 days notice of resignation.

The Court examines claims of adverse action through a "case-by-case approach, examining the unique factors relevant to the situation at hand." McGowan, 472 F.3d at 742. "Petty slights, minor annoyances, and simple lack of good manners" will not deter "a reasonable worker from making or supporting a charge of discrimination." Id. Deciding whether an employer's actions are "materially adverse" is a case-specific exercise that requires an objective inquiry that does not turn on a plaintiff's personal feelings. Semsroth v. City of Wichita, 555 F.3d 1182, 1184-85 (10th Cir. 2009).

Here, viewing the evidence in the light most favorable to plaintiff, the Court finds that a reasonable jury would conclude that the alleged retaliatory acts, when considered in the aggregate, rise to the level of materially adverse action.

### 3.    Casual Connection

The Tenth Circuit has held that "[t]he causal connection may be demonstrated by evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action." Meiners v. Univ. of Kan., 359 F.3d 1222, 1231 (10th Cir. 2004)).  However, "unless the [adverse action] is very closely connected in time to the protected activity, the plaintiff must rely on additional evidence beyond mere temporal proximity." Id.  A six-week period between protected activity and adverse action may be sufficient, standing alone, to show causation, but a three-month period, standing alone, is insufficient. Id.; see Hanson v. Colo. Judicial Dep't, 564 F. App'x 916, 920 (10th Cir. 2014) (four month period between complaint and termination too protracted to infer causation).

Here, the alleged harassment began shortly after plaintiff  reported sexual harassment of other employees, and continued until she left Nueterra.  This is sufficient to permit a reasonable jury to find the requisite causal connection between plaintiff's protected activity and the alleged harassment.

### 4.    Basis For Nueterra Liability

Finally, Nueterra points out that plaintiff's retaliatory harassment claim relies in large part on conduct of Ridgewood and Drs. Poggi and Gaston, and asserts that Nueterra is not liable for retaliatory harassment by Ridgewood or Drs. Poggi or Gaston.  Plaintiff points out that the Tenth Circuit has found employers liable for failure of supervisors to take action to prevent retaliation by

-30-

coworkers.  See Juarez v. Utah, 263 F. App'x 726, 737 (10th Cir. 2008).[25]  Nueterra notes that an

employer is liable for coworker retaliatory harassment only if supervisory personnel orchestrate it

or know about it and acquiesce in it.  See id.[26]

Here, viewed in a light most favorable to plaintiff, a jury could find that Nueterra acquiesced

in a retaliatory hostile work environment at Ridgewood.  Moreover, given the close relationship

between Nueterra and Ridgewood, a jury could find that Nueterra had the means to influence

Ridgewood to eliminate the hostile work environment.  The Court finds that Nueterra is not entitled

to summary judgment on plaintiff's claim of retaliatory harassment.

B.      Retaliatory Constructive Discharge

Nueterra asserts that because she voluntarily resigned, it is entitled to summary judgment on

Furr's claim that it constructively discharged her in retaliation for protected opposition.

The Court evaluates the voluntariness of an employee's resignation under an objective,

totality of the circumstances standard.  Id.  The constructive discharge bar is "quite high."  Garrett

v. Hewlett-Packard Co., 305 F.3d 1210, 1221 (10th Cir. 2002).  The question is not whether

---

[25]      The Tenth Circuit has also found employers liable for the failure of a supervisor to prevent harassment by customers.  See Lockard v. Pizza Hut Inc., 162 F.3 1062, 1073 (10th Cir. 1998).

[26]      Nueterra also argues that it did not employ Drs. Poggi and Gaston and that therefore they were not coworkers.  Nueterra relies on Stoner v. Ark. Dep't of Corr., 983 F. Supp.2d 1074 (E.D. Ark. 2013).  In Stoner, CMS contracted with the Arizona Department of Corrections ("ADOC") to provide medical services to inmates.  CMS hired, supervised and paid nurses – including plaintiff – to perform these duties.  Plaintiff alleged that ADOC officials retaliated against her for making complaints of sexual harassment, and that CMS should be held responsible under Title VII.  Id. at 1089.  The federal district court declined to extend Title VII employer liability to third-party retaliation claims, finding no legal authority to do so.  Id. at 1089, 1102 (denying ADOC motion for summary judgment on retaliation but finding as matter of law that CMS was not responsible for ADOC actions).

plaintiff's working conditions were difficult or unpleasant.  See Exum v. U.S. Olympic Comm., 389 F.3d 1130, 1135 (10th Cir. 2004).  Instead, plaintiff must show that she had no choice but to quit. The Court applies an objective test; the employee's subjective views of the situation and the employer's subjective intent are not relevant.

Nueterra argues that plaintiff's claim that her conditions were intolerable is belied by the fact that she waited to resign until after she found another job. Nueterra argues that if the conditions were truly intolerable,  plaintiff would have resigned immediately, even without the prospect of another job.  Land v. Midwest Office Tech., Inc., 114 F. Supp.2d 1121, 1146 (D. Kan. 2000) (no constructive discharge in part because plaintiff sought jobs with other employers before she resigned); Sims v. Brown & Root Indus. Servs., Inc., 889 F. Supp. 920, 931 (W.D. La. 1995) (same); see also Canady v. John Morrell & Co., 247 F. Supp.2d 1107, 1130 (N.D. Iowa 2003) (evidence that plaintiff did not quit until she found other employment may support finding that plaintiff not constructively discharged).

Here,  plaintiff alleges that Nueterra constructively discharged her when Krause told her that he could not protect her and that she should find another job.  The Court notes that a constructive discharge claim may lie where an employee resigns in the face of an impending and inevitable termination.  See Lopez v. S.B. Thomas, 831 F.2d 1184, 1189 (2d Cir. 1987) (constructive discharge where employer told plaintiff it would fire him at end of 90-day period).  Apprehension of future termination, however, is insufficient to establish constructive discharge; "an employee is obliged not to assume the worst, and not to jump to conclusions too fast." Torrech-Hernandez v. Gen. Elec. Co., 519 F.3d 41, 52 (1st Cir. 2008); see also Stetson, v. NYNEX Serv. Co., 995 F.2d 355, 361 (2d Cir. 1993) (no constructive discharge where employer never expressly or implicitly suggested that it would terminate plaintiff's employment).

Plaintiff presented evidence that her direct supervisor told her that "'they're wanting you to quit," and that it would be best for her to look for another position.  Standing alone, this may not give  rise to a constructive discharge claim based on inevitable termination.  See Rother v. NYS Dep't of Corr. & Cmty. Supervision, 970 F. Supp.2d 78, 95 (N.D.N.Y. 2013).  Combined with the evidence of a hostile work environment, however, the Court finds that plaintiff has set forth evidence from which a jury could find that Nueterra constructively discharged her in retaliation for engaging in protected opposition.

**IT IS THEREFORE ORDERED** that Defendant Nueterra Healthcare Management, LLC's Motion For Summary Judgment (Doc. #80) filed March 4, 2015 is **SUSTAINED IN PART** as to plaintiff's claims of hostile work environment based on sex and constructive discharge based on sex. Plaintiff's claims that Nueterra subjected her to retaliatory harassment and retaliatory constructive discharge remain in the case.[27]

**IT IS FURTHER ORDERED** that as set out in the pretrial order, the parties shall mediate the claims remaining in this case within 60 calendar days from the date of this Memorandum And Order.  See Pretrial Order (Doc. #78) at 11.

Dated this 28th day of June, 2016 at Kansas City, Kansas.

s/ Kathryn H. Vratil
Kathryn H. Vratil
United States District Court

---

[27]     As noted, plaintiff also alleges that Ridgewood and Dr. Poggi tortiously interfered with her employment contract with Nueterra.  In a separate memorandum and order, the Court addresses the Motion For Summary Judgment (Doc. #82) which Ridgewood and Dr. Poggi filed on March 4, 2015.