## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

GRACE FURR,               )
                                )
             **Plaintiff,**         )
                                )     **CIVIL ACTION**
**v.**                             )
                                )     **No. 14-1011-KHV**
**RIDGEWOOD SURGERY AND**   )
**ENDOSCOPY CENTER, LLC;**     )
**NUETERRA HEALTHCARE**      )
**MANAGEMENT, LLC and**       )
**JOSEPH T. POGGI, III, M.D.,**   )
                                )
             **Defendants.**      )
_____)

### MEMORANDUM AND ORDER

Grace Furr brings claims against her former employer, Nueterra Healthcare Management, LLC ("Nueterra"), Ridgewood Surgery & Endoscopy Center, LLC ("Ridgewood") and Joseph T. Poggi, III., M.D. ("Dr. Poggi"). Under Kansas common law, plaintiff alleges that Ridgewood and Dr. Poggi tortiously interfered with her employment contract with Nueterra. This matter comes before the Court on the Motion For Summary Judgment (Doc. #82) which Ridgewood and Dr. Poggi filed on March 4, 2015. For reasons set forth below, the Court finds that the motion should be overruled.[1]

---

[1] Under Title VII, 42 U.S.C § 2000e et seq., plaintiff alleges that Nueterra created a sexually hostile work environment, constructively discharged her based on sex and retaliated because she engaged in protected activity. In a separate memorandum and order, the Court addresses Defendant Nueterra Healthcare Management, LLC's Motion For Summary Judgment (Doc. #80) filed March 4, 2015.

**Legal Standards**

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986); Hill v. Allstate Ins. Co., 479 F.3d 735, 740 (10th Cir. 2007). A factual dispute is "material" only if it "might affect the outcome of the suit under the governing law." Liberty Lobby, 477 U.S. at 248. A "genuine" factual dispute requires more than a mere scintilla of evidence in support of a party's position. Id. at 252.

The moving party bears the initial burden of showing the absence of any genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Nahno-Lopez v. Houser, 625 F.3d 1279, 1283 (10th Cir. 2010). Once the moving party meets the initial burden, the burden shifts to the nonmoving party to demonstrate that genuine issues remain for trial as to those dispositive matters for which she carries the burden of proof. Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990); see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986). To carry her burden, the nonmoving party may not rest on her pleadings but must instead set forth specific facts supported by competent evidence. Nahno-Lopez, 625 F.3d at 1283.

The Court views the record in the light most favorable to the nonmoving party. Deepwater Invs., Ltd. v. Jackson Hole Ski Corp., 938 F.2d 1105, 1110 (10th Cir. 1991). It may grant summary judgment if the nonmoving party's evidence is merely colorable or is not significantly probative. Liberty Lobby, 477 U.S. at 250-51. In response to a motion for summary judgment, a party cannot rely on ignorance of facts, on speculation or on suspicion, and may not escape summary judgment in the mere hope that something will turn up at trial. Conaway v. Smith, 853 F.2d 789, 794 (10th

2

Cir. 1988).  The heart of the inquiry is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law."  Liberty Lobby, 477 U.S. at 251-52.

### Facts[2]

The following facts are either uncontroverted, deemed admitted or construed in the light most favorable to plaintiff, the non-movant.

Ridgewood is an ambulatory surgery center in Wichita, Kansas.  Nueterra manages Ridgewood and employs all clinical and business staff for the facility.[3]  Nueterra does not employ the physicians who work at Ridgewood.  The Development and Management Agreement ("Management Agreement") between Nueterra and Ridgewood governs Nueterra's duties as manager and provider of day-to-day operations at the facility.  Nueterra and Ridgewood are partners with a fiduciary relationship.

Nueterra Holdings, LLC, a Nueterra entity which is separate from Nueterra and not a party to this lawsuit, is a minority owner of Ridgewood.  Nueterra Holdings, LLC and a group of individual physicians, including Dr. Poggi, invested in Ridgewood and each had an ownership interest in it.  The Ridgewood Medical Staff Bylaws and the Ridgewood Operating Agreement govern the relationship between all Ridgewood investors, including Nueterra Holdings and the individual defendants.  Goff Depo. at 41-42.

---

[2]     The Court disregards all legal arguments which the parties include in their statements of fact and responses to statements of fact.  See D. Kan. Rule 56.1.

[3]     Nueterra develops and manages ambulatory surgical centers throughout the United States.  Nueterra was instrumental in creating Ridgewood; it met with physicians about creating an outpatient surgical center and provided the documents to create and operate the facility, including the Operating Agreement and Medical Staff Bylaws.

The Ridgewood Medical Staff Bylaws govern the credentialed physicians at Ridgewood, and establish a Credentialing Committee which also acts as the Continuous Quality Improvement Committee ("CQI Committee").  The CQI Committee makes recommendations for privileges, patient safety and risk management and reviews and assesses the quality of care.  The CQI Committee also has a duty to "investigate charges of misconduct by Medical Staff Members and Allied Health Professionals and make corrective action recommendations to the Governing Body." Doc. #81-8, § 7.5.6.

In March of 2007, Nueterra hired Grace Furr, a licensed registered nurse, as Clinical Administrator for Ridgewood.  Furr entered a written employment contract with Nueterra. Furr's contract specified that she reported to Kim Krause, Nueterra Employer Group Vice President. NUE 219.[4]

Dr. Poggi is an original investor at Ridgewood who performs surgery at Ridgewood and at other locations.  Dr. Poggi is one of the largest producers of revenue at Ridgewood.  From 2007 to May of 2011, he served on the Ridgewood Board of Managers.

Dr. Gerry Gaston is a surgeon who is an original investor at Ridgewood.  Dr. Gaston performs surgeries at Ridgewood and other locations.  Dr. Gaston is one of the largest producers of revenue at Ridgewood.  From 2007 to the present, Dr. Gaston served on the Ridgewood Board of Managers, and from 2007 to May of 2011, he served as the board chair.

---

[4]  Furr's job description required that she (1) handle conflict and criticism, (2) interact in a professional and tactful manner with others, (3) manage difficult or emotional situations in a professional manner, (4) participate in patient care, (5) support risk management, (6) ensure that staff follow policies and procedures and (7) coordinate collection of information for preparation of risk management reports.  Furr testified that she did not provide primary care for patients during the last few years of her employment at Nueterra.  Furr testified that her duties also included reporting allegations of sexual harassment to Krause.

Dr. Stephen Olson is an original investor at Ridgewood who performs surgeries at Ridgewood and other locations. From May 2011 to the present, Dr. Olson has served on the Ridgewood Board of Managers. He has served as chairman of the board from 2013 to the present.

Dr. Douglas Friesen is an anesthesiologist who is an original investor at Ridgewood. Dr. Friesen administers anesthesia during surgeries at Ridgewood and other locations. Dr. Friesen is also the Medical Director for Ridgewood. He has served on the Ridgewood Board of Managers from 2007 to the present.

Dr. Jace Hyder is a surgeon who is an original investor at Ridgewood. He served on the Ridgewood Board of Managers from 2007 to 2013 and was chairman from 2011 to 2013. Dr. Hyder knew Furr before she began working at Ridgewood, and recommended to Nueterra that it hire her as administrator of the practice.

In 2011, the members of the CQI committee included Drs. Olson, Friesen, Hyder, Francis Abraham, Larry Abraham, Reena Patel and two nurses. In 2012, the CQI committee included Drs. Olson, Friesen, Hyder, Francis Abraham, Neff, Babb and two nurses.

<u>2011-12 Sexual Harassment Allegations And Investigation</u>

On August 5, 2011, a staff member told Furr that another employee, nurse Lacey Henningson, had told her that Dr. Poggi had engaged in inappropriate sexual behavior. Also in August of 2011, another employee complained that Dr. Gaston had engaged in inappropriate touching and sexual comments. In September of 2011, Furr reported these complaints to Nueterra Human Resources, which conducted an investigation.[5] At the direction of Nueterra HR, Furr

---

[5] Nueterra's investigation indicated that Drs. Poggi and Gaston had engaged in inappropriate conduct of a sexual nature. Although plaintiff has presented evidence of the details of that conduct, those details are not required for the Court to rule on the issues in this case.

retained a folder of all emails about the sexual harassment issue and prepared a detailed chronology of events that employees had reported to her. Nueterra HR interviewed Furr and at least seven other Nueterra employees – but not any physicians – concerning possible sexual harassment by physicians.[6]

Nueterra determined that Ridgewood was an environment "at risk," so it referred the matter to Ridgewood to investigate allegations against the physicians. Doc. #93-1 at 38-41. Nueterra sent its attorney, Wyatt Wright, to a meeting with the Ridgewood board in September of 2011.

Nueterra and Ridgewood responded to reports of sexual harassment by Drs. Poggi and Gaston by requiring the nursing staff to attend sexual harassment training at Ridgewood on December 5, 2012.[7] In that training, Nueterra discussed employees' responsibilities not to engage in sexually charged behavior. It also explained how to report allegations of hostile work environment. Goff Depo. at 174. No Ridgewood physicians attended, and Ridgewood did not ask Drs. Poggi or Gaston to attend sexual harassment training.

On December 5, 2011, Henningson told Furr that Dr. Gaston was being rude to her and that she thought other doctors had told Dr. Gaston that she had complained about his behavior. Nueterra's HR team interviewed Henningson, who stated that she did not think that Dr. Gaston was retaliating. A few days later, Dr. Gaston told Furr that "if [Henningson] has such a problem with me, then keep her out of my [operating] room." NUE 200. Dr. Gaston further stated as follows:

> It all needs to stop, the back-rubbing, hugging. You hug people. Someone slapped
> me on the ass yesterday, & I won't tell you who. You're going to force surgeons out

---

[6]     Furr did not interview any employees and Nueterra did not allow her to attend the employee interviews.

[7]     Furr did not direct the employees to attend the training and she did not present the training. She attended the training as a Nueterra employee.

of here and I will be the first to go.

Id.

The Ridgewood CQI committee decided that Drs. Gaston and Poggi should be counseled about the inappropriateness of their behavior.  On December 28, 2011, Dr. Hyder, Ridgewood Board Chairman, and Dr. Friesen, Ridgewood Medical Director and Chairperson of the Ridgewood Risk Management Committee, spoke to Dr. Gaston about the allegations of sexual harassment.  Dr. Gaston apologized and agreed to only engage in actions that were "appropriate and professional." Doc. #81-15 at 2.

On January 3, 2012, Dr. Hyder, Dr. Friesen and two Nueterra representatives met with Dr. Poggi about the allegations against him.  Dr. Poggi apologized and promised to act in a professional manner in the future.  Dr. Friesen later warned Dr. Poggi that the Board would monitor his behavior and that if he engaged in inappropriate conduct he would likely lose his privileges to operate at Ridgewood.  Although Nueterra recommended to Ridgewood that it require Dr. Poggi to obtain counseling at his own expense, Ridgewood did not implement that recommendation.

After the conversations with Drs. Poggi and Gaston, no one made further complaints of sexual harassment at Ridgewood while Furr worked there, and no one filed a Charge of Discrimination with the Equal Employment Opportunity Commission or the Kansas Human Rights Commission related to sexual harassment by Drs. Poggi or Gaston in 2011 or early 2012.

<u>Furr's Allegations of Retaliation</u>

Dr. Gaston had never treated Furr very well,[8] but after the sexual harassment investigation he treated her much worse.  Furr testified that he was very angry all the time.  Furr Depo. at 396. Another employee observed that Dr. Gaston used a degrading tone of voice in speaking to Furr.

Dr. Poggi also treated Furr differently after the sexual harassment investigation.  Dr. Poggi had previously been cordial to Furr, but after the sexual harassment investigation he spoke to her in an angry tone on several occasions about the loss of a scrub tech.  <u>Id.</u> at 172-73.  Dr. Poggi did not talk to Furr at all between March and October of 2012.

Furr testified that many times, Dr. Gaston came into her office and yelled at her – sometimes when he was about one foot from her face.  <u>Id.</u> at 104.  Furr felt threatened when Dr. Gaston spoke to her about financial issues in a hateful and demeaning tone of voice.  Dr. Gaston told Furr, "I hate Nueterra, I want to fire them, and you're Nueterra."  <u>Id.</u> at 106.  In an apparent reference to Furr, Dr. Gaston referred to Medicare and Medicaid regulations to clinical staff as "Gracie's rules."[9]  <u>Id.</u> at 111-12.  Dr. Gaston's anger at Nueterra caused Furr to believe that he was possessed by a demon. <u>Id.</u> at 105-06.  Furr believed that in a business situation, being "really angry" was "unethical" and "inappropriate."  <u>Id.</u> at 105-06.

On May 20, 2012, Dr. Gaston sent an email to Furr and Krause asking questions about financial reports.  Furr Depo. Ex. 7.  After Furr responded, Dr. Gaston followed up with another

---

[8]    Furr testified that"the entire time I was there, I felt that he was – treated the other staff differently than what he did me."  Furr Depo. at 343-44.

[9]    Dr. Gaston told Nueterra surgery employees that "[w]hat happens in the back stays in the back" and "Gracie doesn't need to know this stuff."  Furr Depo. at 118.

8

email in which he criticized Furr's plan to fire a certain scrub tech.[10]  Furr Depo. Ex. 8, Furr Depo. at 150-52.  On June 3, Krause responded to Gaston's criticism about Nueterra's plan to terminate the scrub tech, stating that the management agreement gave Nueterra the right to make the decision. Furr Depo. Ex. 23; Furr Depo. at 320-22.

On August 29, 2012, Nueterra HR Manager Marilyn Dawson contacted Furr for a periodic "touchpoint call."  Dawson asked Furr about personnel issues at Ridgewood.  Doc. #81-18.  Furr told Dawson that Dr. Gaston had been "hostile" towards her "to the point where I could file on [him]." Id.  Furr complained that Dr. Gaston "vetoed" Nueterra's decision to terminate an employee who was always late, and that Dr. Gaston often said that he "hates Nueterra's guts."[11]  Id.  Furr confirmed that Dr. Gaston had never called her a name or touched her.  Dawson's notes about the call state that "HR will study the history of complaints against physicians" and that an "RN involved

_____

[10]     Krause described the situation as follows:

> Scrub tech had been late a rediculous [sic] level and gone on a long time.  Every time it was brought up to the board [it] tied my hands with dealing with.  Approved the new[] policy and continues to be late.  Board said we should follow policy.  When we got to point when [employee] would be terminated, Dr. [came] into Admin. Office having meltdown that we cannot term.  Another board chair says you should not allow him to come in there and do that.

Doc. #83-2 at 5.

[11]     Around this time, Furr wrote an email to a relative in which she stated that Dr. Gaston "was possessed by a demon."  She later explained as follows:

> Dr. Gaston would come to my office and yell and carry on and say, I hate Nueterra and I hate you, and he would be in my face.  And there were times that he was in my face, so angry with so much hate that I – literally, my hair would be on end and I felt like I was – couldn't breathe, it was so upsetting.  At one point, I – he came in my office one day and was probably a foot from my face and was so angry. And there were many times of that.

Furr Depo. at 104.

in the hoopla last year went somewhere else." Id.

Dawson reported Furr's complaints to Krause, who spoke to Ridgewood board chair Dr. Hyder and medical director Dr. Friesen on August 29 or 30.

On August 30, 2012, Krause spoke with Dawson, who recorded the following notes:

Dr. Gaston is one of the doctors who had his hands slapped for inappropriate behavior with the nurses and it continues to be a "burr" with him. He does not think that HR handled it appropriately. [Krause] stated that he personally thought HR handled it right. The doctor has several things going on: nasty divorce, turned down for employment with another hospital, Ridgewood having financial difficulties. He is grumpy and mad all the time with everyone. I have asked the Board Chair and Dr. Friesen (Medical Director) to get involved. They are looking at a merger and we want the merger to go through.[12]

Doc. #81-18.

On August 31, 2012, to ease the tension between Dr. Gaston and Furr, Dr. Friesen told Dr. Gaston not to speak to Furr without someone else present. Dr. Gaston complied, and did not have any further one-on-one conversations with Furr. Doc. #81-15.

On September 11, 2012, Dawson sent an email to Cassandra Speier, Nueterra Senior Vice President, about the phone call on August 29 during which Furr told Dawson that Dr. Gaston had been very hostile to her. Dawson wrote that "this is a very delicate situation with the merger that [Krause] explained must go through. [Krause] asked that we leave it alone for now." Doc. #83-2 at 6. In another email that day, Dawson wrote that she had determined that she had a duty to act and to give notice of a potential claim to Nueterra's insurance carrier. She also stated that "I do not want to make a move that would jeopardize the merger." NUE 1933.

On September 13, 2012, Furr told Dawson that things were much better and that Dr. Gaston

---

[12]    Throughout 2012, the Ridgewood board was discussing a possible merger with another ambulatory surgery center.

10

was avoiding her, which she assumed was because Dr. Friesen had spoken to him. Furr stated that Dr. Gaston had been on an "I hate Nueterra kick all this time," and that he saw Furr as Nueterra. Dawson Affidavit. Dawson told Furr to call her if she had any more trouble with Dr. Gaston.

On September 26, 2012, Dr. Gaston sent an email to Krause and upper management at Nueterra, including Daniel Tasset, chairman of Nueterra Holdings.[13] The subject line of his email was "Sinking." Dr. Gaston expressed frustration with the slow process of the possible merger and other concerns. Regarding Furr, he stated as follows:

> This cash call was such an emergency yet Grace simply showed up to physician's offices with no explanation and wanted a signature. . . . So in the middle of our crisis Grace takes a week of vacation. Wow . . . . . REALLY!!! That really looks like strong dedication on her part. Physicians see this. Employees see this!! Employees are searching for jobs elsewhere because they are not getting full paychecks. We have lost great employees!

Doc. #81-23 at 3. Dr. Poggi replied to Dr. Gaston's email and expressed that he too was a "frustrated investor that is confused by Ridgewood's performance and management." NUE 1865. Dr. Poggi suggested that perhaps Ridgewood should replace Nueterra as the management company.[14]   On September 27, 2012, Krause sent an email to David Ayers, CEO of Nueterra, which stated in part as follows:

> Let me begin by saying that I do not concur with the majority of the items mentioned in [Dr. Gaston's] email. . . . Our HR department, legal department and board of Managers had to advise him that his sexual approaches and comments to nurses were inappropriate within the walls of [Ridgewood]. He feels he has been humiliated on this subject and blames everyone else but himself for doing what he did. He is upset because he is no longer the Chairman of the board and feels that Dr. Hyder and [Dr.] Olson should not hold seats on the board because of their low case volume. Also, our administrator Grace Furr, is very close to filing a hostile work complaint against Dr. Gaston for serious verbal abuse. Cassandra and HR are advised of this. There

---

[13]   Tasset owns the majority of Nueterra stock. Goff Depo. at 190.

[14]   Dr. Gaston and Dr. Poggi did not send copies of these emails to Furr.

are also physicians and staff that have witnessed this behavior.

NUE 1830. Ayers forwarded Krause's email with comments to Tasset, Marc Goff, Nueterra Chief Operating Officer, and Speier, Nueterra Senior Vice President. Ayers did not address Furr's situation, but focused on the financial problems at Ridgewood and how to protect Nueterra's investment. NUE 1800. Tasset responded as follows:

> I'd like to see financials, etc. regarding this facility as well as projections. Let's not be too anxious to exit this market. I'd like to see us resolve their concerns and complaints FIRST and then go from there.

NUE 1829. He did not specifically address Dr. Gaston's behavior.

On October 1, 2012, Krause told Furr that someone had sent emails to management saying things about Furr that were not true, but that he had defended her. He did not show her the emails; he said that "it would just upset her more." Furr Depo. at 114.

On October 4, 2012, Dr. Poggi and Furr began talking about his operating experience at Ridgewood, and Furr's performance. Id. at 180. Furr testified that Dr. Poggi yelled at her for about 45 minutes and that at one point,"[h]e told me I needed to figure out a way to fire Valerie [Beltz] because he was vehemently angry at her for her part in talking Lacey [Henningson] into coming and telling me about the sexual harassment." Id. at 183-84. Dr. Poggi told Furr that "it would be best for her that she keeps the surgeons happy and that if [Krause] with [Nueterra] wasn't helping her then she should go to his boss and if his boss didn't help her to go to that person's boss." Doc. #83-1; Poggi Depo. at 161-62. Dr. Poggi also told Furr that she needed to do whatever she could to make Dr. Gaston happy.[15]

---

[15]   Another Nueterra employee heard Dr. Poggi raise his voice many times during the closed-door meeting.

After the meeting, Furr went to speak with another physician investor, Francis Abraham, at his home.[15]  She told him that she was upset about her conversation with Dr. Poggi.  Dr. Abraham told Furr that he did not want her to quit and that he felt she did a good job.  Furr Depo. at 71.

On October 5, 2012, Furr sent an email to Krause, Marilyn Dawson, Human Resources Vice President Nikki Johnson, Speier, and U.S. Chief Operations Officer Marc Goff (all Nuetera employees).  Doc. #81-24.  The email said that she was in a "very hostile work environment" and had been "attacked personally and harassed" by "a few" physicians.  Furr wrote that the former board chair [Dr. Gaston] had been mean to her from the center's inception, and he was sometimes confrontational and sometimes ignored her.  She complained that Dr. Poggi had attacked her, blamed her for employees leaving and told her that she had "done a terrible job" as the administrator and that she was at fault for all of the "HR nightmare issues."[16]  Furr stated that she was considering looking for work elsewhere and was having trouble sleeping at night.[17]

Within an hour of receiving the email, Dawson called Furr to discuss Furr's complaints.  Furr told Dawson that "I know these two crazy physicians probably email garbage to Dan [Tasset] and

---

[15]     Furr testified that she liked and trusted Dr. Abraham.

[16]     Although Furr's email claimed she had been "attacked" for the "third time," when questioned she could only remember one other unpleasant conversation with Dr. Poggi, which lasted "a few minutes" and occurred in the break room when Dr. Poggi was unhappy that his favorite scrub tech had resigned.  He did not call her names.  Furr Depo. at 178-80.

[17]     Furr later testified that her email on October 5, 2012 was a "cry for help," as follows:

Well, I – in that e-mail, I was crying out for protection from them, to help me to know what to do to – there was so many things going on with all the harassment and stuff that had happened and then me feeling like I had been retaliated against, and I sent that as a cry out for help.

Furr Depo. at 346.

Dave [Ayers]." Doc. #83-2 at 12. Furr said that Dr. Poggi had blamed her for his favorite scrub tech leaving. Furr said that the employee "was [a good scrub tech] but I also think [Dr. Poggi] thought he could continue to behave naughty with her." Doc. #83-2 at 12. Furr told Dawson that Ridgewood was "in a terrible situation," that "not having money to pay vendors is a nightmare," it is "always tight and stressful" with expenses, and that "the situation has created a fire storm." Dawson Affidavit. Furr also stated that the doctors put blame on Furr and said she should be "getting doctors in the door." Id.

On October 8, 2012, Krause and members of Nueterra HR held a telephone conference call with Furr. Furr stated that she just wanted to find another job but was worried about the 90-day notice in her contract. Doc. #83-2 at 14. Furr stated that Dr. Poggi told her that his low case volume was her fault. She stated that Dr. Poggi told her that if she wanted to stay at Ridgewood, she needed to buddy up to Dr. Gaston and that Dr. Poggi did not "give a crap" about any paperwork. Furr said that "[Dr.] Gaston calls any rules from the state or Nueterra 'Gracie's Rules.' I am job hunting. How do I stay here with that? Dr. Gaston has the largest volume and without him this place will close." Id. at 14. Furr stated that Dr. Gaston had never been kind to her on any level. Krause stated that "[t]here has been a change in Dr. Gaston in the last 9-12 months" and that "[Furr] has done a great job here." Id. Goff told Furr that Nueterra wanted its employees to have a safe place to work, free of harassment.

After this telephone interview, Nueterra decided that it had a duty to investigate Furr's complaint. Although Krause had stated that physicians and staff had witnessed harassment of Furr,

Nueterra did not interview witnesses other than Furr.[18]  Marconia Goff, Nueterra Senior Vice President and corporate representative, testified that she was not sure whether someone made the decision not to interview witnesses.  Goff testified that Nueterra did not follow the same process in investigating Furr's complaints as it had with respect to the earlier sexual harassment complaints. Goff Depo. at 236.

On October 8, 2012, the Ridgewood Board met with Furr.  Dr. Friesen said that he wanted Furr to work at the surgery center sometimes when it was open on Saturdays and also work one day per week in the "back," i.e. the surgery rooms.[19]  Furr Depo. at 227.  Dr. Friesen stated that this

---

[18]     Furr testified that when she complained, she had hoped Nueterra would take steps to protect her in the same way it protected the staff from sexual harassment, as follows:

> When I had a nurse come to tell me that she was being sexually harassed, I immediately told my boss, Kim Krause, and he said that he was going to be talking to HR and to, I guess, his superior.  And HR did a full – they did an investigation, they talked to employees, and they asked me questions.  Wyatt Wright was involved, he came to a board meeting.  I think there were meetings with – between physicians that I was not part of and nor was I a part of the meetings or the discussions with the employees.  They were one on one with them. . . . It seemed to me that they had done quite a lot to address the situation.

Furr Depo. at 394-95.

[19]     On November 8, 2012, Dr. Friesen sent Krause an email in which he asserted that he did not know about Furr's complaint until days after the October 8 meeting, as follows:

> I believe somewhere in our minutes [it] should be noted that the "official date" of the HR letter which was presented to me was on October 10 (via email from you).  I know it was written on the 4th, however, I did not become aware of its' [sic] contents until the 10th.  This I believe should circumvent any perception of retaliation regarding the issues I presented about nurse manager in our Board meeting on the 8th.

(continued...)

would be cost-effective and improve employee morale.[20]  Furr expressed concern that she did not feel confident providing patient care.  Dr. Gaston responded that based on more than 20 years of nursing experience, she could easily regain her patient-care skills.

Shortly after the board meeting on October 8, 2012, Krause told Furr that she did not need to work on Saturdays or work in the back.  Furr never worked on Saturday after that meeting.

On October 10, 2012, Krause forwarded Furr's email of October 5th to Dr. Friesen, Ridgewood Medical Director.  He told Dr. Friesen to keep it confidential and to "make sure there is no retaliation."  Doc. #81-30.

On October 12, 2012, Dr. Gaston wrote to Nueterra CEO Ayers.  He stated that Furr took anything physicians said "as verbal harassment."  Doc. #93-34.  He blamed Furr for employees looking for work elsewhere.  He criticized Krause as lacking "the ability to move us along and pull us out of our problems."  Id.  The email concluded, "[w]e need a change."  Id.  On October 15, 2012, Ayers forwarded Dr. Gaston's email to Goff, Speier and Krause.  He stated as follows:

> Marc, this situation isn't improving according to Dr. Gaston.  I know there are many moving parts, and as many perceptions as there are people involved, but we need to bring this to a head.  I don't think our administrator is seeing clearly at this point, and I'm also sure we have a group of dysfunctional physicians.  Please meet with your team and let me know how you wish to proceed.

---

[19](...continued)

Doc. #81-29.  In a later affidavit, however, Dr. Friesen stated that he learned about Furr's complaint on October 8, 2012 *after* the board meeting.  He stated that Krause told him that Furr had written an email complaining about Dr. Poggi to Nueterra HR and management, and that he would send the email to Dr. Friesen later.

[20]     Although Furr often went to the surgery center on Saturday mornings, she had never worked a full Saturday at Ridgewood.

NUE 1766.

Dr. Friesen testified that in response to Furr's complaint of October 5, the CQI committee met to discuss the issues which she raised. He testified that the committee decided that Drs. Hyder and Friesen would meet with Dr. Poggi to discuss Furr's email and that Drs. Patel and Francis Abraham would meet with Furr.

On October 17, 2012, Drs. Patel and Abraham spoke with Furr. They told her that they supported her, that they thought she had done a good job and that they did not want her to quit. Drs. Hyder, Olson and Gaston never told Furr they wanted her to quit.

Dr. Friesen testified that he first shared Furr's email with Dr. Poggi on October 18, when he and Dr. Hyder met with him. Dr. Poggi expressed surprise at Furr's allegations and stated that on October 5, he thought he had had a constructive conversation with Furr about his concerns about the operating room experience and facility management.

That same day, October 18, 2012, Dr. Poggi sent an email to Dr. Friesen about Furr's allegation that he was harassing and retaliating against her, as follows:

> This is ridiculous. It is crazy to expect me to keep working at Ridgewood. Crazy. What assurance do I have to protect ME? . . . I WILL pull all my cases to protect myself if I do not hear about the conclusion of this by next Friday.

Doc. #83-1 at 19. Dr. Poggi asked Dr. Friesen to forward the email to Krause and others. Id.

On October 30, 2012, the CQI Committee found that to resolve the matter, "both parties need to be addressed." The committee recommended that Nueterra send Furr for training in handling

17

conflicts, which it called "re-education."[21]  It also directed that if a physician had an issue which required Furr's attention, they should take it to Dr. Hyder or Dr. Friesen or take a witness with them when they talked to Furr.

The CQI Committee gave Krause and Speier a copy of the recommendations.  Krause and Speier told Dr. Friesen that Nueterra did not believe that Ridgewood's recommendations regarding Furr were appropriate.  Nueterra did not require Furr to undergo any kind of training because it did not agree with the recommendation.[21]

On November 1, Dawson contacted Furr and Furr told her "it is calm now."

Within a few weeks after Furr's complaint of October 5, 2012, Krause suggested to Furr that she apply for a clinical position elsewhere with Nueterra.[22]  Shortly after that, he told Furr that "I feel they're wanting you to quit."  Furr Depo. at 239.  Furr testified that Krause told her that he could not protect her from the retaliation and it would be best for her to quit.  She explained as follows:

> Krause had told me that he had felt it best that I look for employment elsewhere. And I am the one that made that decision to do that, but basically exactly what he told me was is that he didn't feel like he could protect me, that they were very angry at me and that the retal – he told me he did not think the retaliation would stop and those were his words.  He said that he felt like – he said, it makes me sick to tell you this but I feel like that you probably should look for a job elsewhere and I'll be a

---

[21]    The CQI Committee did not recommend that Dr. Gaston or Dr. Poggi receive any re-education.

[21]    Before she resigned, no one at Ridgewood or Nueterra told Furr that the CQI committee had recommended that she receive training.

[22]    Furr inquired about that but never heard anything back from Nueterra.

great reference for you.

Id. at 289-90.  Krause told Furr he did not want to end up getting fired himself while trying to protect her.  Krause told Furr that Ridgewood physicians had sent emails to Tasset which contained false information about her, and that Krause had told Nueterra that those things were false.  Id. at 289-91, 294.

### Furr's Resignation

On December 10, 2012, Furr gave Nueterra a six-week notice of resignation.  Although Furr's employment agreement required her to give 90 days' notice or pay Nueterra 90 days' salary, Krause had told her that she could give six weeks notice.  Some time after that, Krause went to Furr's office, put a General Release Agreement on Furr's desk, threw his hands up and said "they want me to give you this."  Id. at 44-45; Plaintiff's Ex. 20.  The release stated that Furr owed Nueterra money for not giving 90 days' notice and proposed that Furr release all claims in exchange for forgiveness of her debt.  Furr did not sign the release.

Furr described her decision to quit as a "spiritual battle" in which she had to choose  between staying at Nueterra or leaving.  Furr Depo. at 242.  She said she decided to "leave peacefully."  Id. at 362.  In Furr's exit interview, she said "I applied for a clinical position with Nueterra, but in the meantime an opportunity fell into my lap here locally.  Had I been offered the position with Nueterra sooner I would (sic) taken it, but did not want to pass the opportunity by that had arose (sic) in the meantime.  I appreciate all Nueterra has done for me, all of the growth opportunities I have been given, and all of the friendships I have made.  Nueterra is a great company."  Furr Depo. Ex. 15.

Furr's Job Performance

Throughout Furr's employment with Nueterra, Krause was Furr's direct supervisor and evaluated her job performance.  On Furr's evaluation for 2010, Krause wrote that "Grace did a tremendous job in managing the center in 2010.  She always gave 100% in all duties performed.  She did an excellent job in managing a very tight budget."  Doc. # 93-14 at 4.  On Furr's evaluation for 2011, Krause stated that Furr exceeds expectations.  In October of 2012, Krause noted that Furr had done a great job.  Krause never indicated in any evaluation that Furr did a bad job.

On December 16, 2013, Furr filed this action in the District Court of Sedgwick County, Kansas, claiming that Nueterra breached her contract by constructively discharging her.  Furr also claimed that Ridgewood and Dr. Poggi induced the breach by creating a hostile work environment and through Dr. Poggi's threat to pull his cases from Ridgewood.  On January 8, 2014, Nueterra filed a notice of removal to this Court.  Doc. #1.

## Analysis

Ridgewood and Dr. Poggi assert that they are entitled to summary judgment on plaintiff's claim that they tortiously interfered with her employment contract with Nueterra.  To recover for tortious interference with contract, plaintiff must show "(1) the contract; (2) the wrongdoer's knowledge thereof; (3) [defendants'] intentional procurement of its breach; (4) the absence of justification; and (5) damages resulting therefrom."  Cohen v. Battaglia, 296 Kan. 542, 546, 293 P.3d 752, 755 (2013) (citing Burcham v. Unison Bancorp, Inc., 276 Kan. 393, 423, 77 P.3d 130, 150 (2003)).  Defendants argue that plaintiff has not demonstrated the second, third, fourth or fifth elements.

Knowledge

20

As to the second element, defendants argue that they did not know that Furr had an employment contract which required 90 days notice by either party. Furr points out that the law does not require that defendants know the details of the contract, only that they knew of the relationship. See Ronald L. Jones Charitable Trust v. Sanders, Nos. 106,690, 106,691, 2012 WL 3966557, at *10 (Kan. App. Sept. 7, 2012). Here, plaintiff has presented evidence that she had a contract with Nueterra to provide management services and that Ridgewood had a fiduciary duty to Nueterra. Ridgewood and Dr. Poggi had constructive knowledge, and presumably actual knowledge, that Nueterra had an employment contract with Nueterra. See Prof'l Inv'rs Life Ins. Co. Inc. v. Roussel, 528 F. Supp. 391, 397 (D. Kan. 1981).

Intentional Procurement Of Breach

As to the third element, defendants argue that (1) plaintiff cannot show that Nueterra breached the employment contract because plaintiff voluntarily resigned and in the alternative, (2) even if Nueterra breached the contract, plaintiff cannot show that Ridgewood or Dr. Poggi intentionally procured the breach. Wolfe Elec., Inc. v. Duckworth, 293 Kan. 375, 391-93, 266 P.3d 516, 526-27 (2011) (third party cannot interfere with contract unless plaintiff shows breach by party to contract).

In ruling on Nueterra's motion for summary judgment, the Court found that plaintiff has set out a genuine issue of material fact whether Nueterra constructively discharged her. Thus there is a genuine issue of material fact whether plaintiff voluntarily resigned. See Leopoldstadt, Inc. v. Kuti, No. 91-2419-GTV, 1992 WL 396330, at *5-6 (D. Kan. Dec. 22, 1992) (Kansas would recognize cause of action for breach of employment contract due to constructive discharge).

21

In the alternative, defendants argue that plaintiff has not produced evidence that Ridgewood or Dr. Poggi intentionally procured Nueterra's breach.  Defendants assert that plaintiff has not produced evidence that Dr. Poggi or Ridgewood ever suggested that Nueterra tell plaintiff that she should quit.  See Shartz v. USD 512, 953 F. Supp. 1208, 1219 (D. Kan. 1997) (no causation where defendant critical of plaintiff's performance but had not suggested forced retirement); see also Koehler v. Cty. of Grand Forks, 658 N.W.2d 741, 748 (N.D. 2003) (no tortious interference claim because alleged co-worker harassment did not cause damages where employee *chose* to leave).  In response, plaintiff points to evidence that after she complained of harassment on October 5, 2012, Dr. Poggi sent an email to Dr. Friesen which threatened to pull his cases from Ridgewood if he did not "hear about the conclusion of this by next Friday."  Dr. Poggi asked Dr. Friesen to forward the email, dated October 18, to Krause and others at Nueterra.  On October 30, 2012, the Ridgewood CQI Committee recommended that Nueterra send Furr for "re-education."  Viewed in a light most favorable to plaintiff, a jury could find that Furr felt compelled to quit because of a retaliatory hostile work environment,  combined with Krause's statement to her that she should resign and find another job because the retaliation would not stop and he could not protect her.[23]  Further, based on the circumstantial evidence, a jury could find that Ridgewood and Dr. Poggi contributed to a retaliatory hostile work environment and that Krause advised Furr to quit because of pressure from Ridgewood

---

[23]     Ridgewood and Dr. Poggi assert that as to them, Krause's statements to Furr – that she should resign because the retaliation would not stop and that he could not protect her – are hearsay and therefore not admissible.  Under Rule 801(c), Fed. R. Evid. "hearsay" is an out-of-court statement offered "to prove the truth of the matter asserted in the statement."  Ridgewood and Dr. Poggi assert that Furr offers the statement to prove that Krause told Furr that she should resign, that the retaliation would not stop and that he could not protect her.  Furr responds that she offers Krause's statements to explain why she felt compelled to quit.  Thus, plaintiff does not offer the statements to prove the truth of Krause's statements.  The statements are therefore not hearsay.

and Dr. Poggi.

Absence of Justification

A person may be justified to interfere with contractual relations in certain situations. Reebles, Inc. v. Bank of Am., N.A., 29 Kan. App.2d 205, 211, 25 P.3d 871, 875 (2001). Interference is justified when the defendant "acts in the exercise of a right equal to or superior to that of the plaintiff" and uses "fair means and good faith" for some lawful interest or purpose. Turner v. Halliburton Co., 240 Kan. 1, 13, 722 P.2d 1106, 1116 (1986).

To determine whether interference was justified, courts may consider some of all the following factors: (1) the nature of defendant's conduct; (2) defendant's motive;  (3) the interests of plaintiff with which defendant's conduct interfered; (4) the interests sought to be advanced by defendant; (5) the social interests in protecting the freedom of action of defendant and the contractual interests of  plaintiff; (6) the proximity or remoteness of defendant's conduct to the interference; and (7) the relations between the parties.  Turner, 240 Kan. at 14; 722 P.2d at 1116-17.

Defendants' motive and the presence or absence of justification (or malice)  are typically questions for the jury. See Burcham, 276 Kan. at 425, 77 P.3d at 152.  Plaintiff's theory is that Ridgewood and Dr. Poggi retaliated against her for opposition to sexual harassment.  Evidence of Title VII retaliation may serve as proof of actual malice.  See Booker v. Mass. Dep't of Public Health, 527 F. Supp.2d 216, 229-30 (D. Mass. 2007).  Where defendant acts with malice, such action is not justified. See id.  Here, viewed in the light most favorable to plaintiff, a reasonable juror could find that Ridgewood and Dr. Poggi acted without justification or privilege in influencing Nueterra to constructively discharge her.

Damages

As for damages, defendants point out that either party could terminate the employment contract with 90 days' notice. Defendants argue that plaintiff's damages are therefore limited to 90 days salary. See Jackson v. Kan. Cty. Ass'n Multiline Pool, No. 03-4181-JAR, 2006 WL 963838, at *20 (D. Kan. April 10, 2006) (at-will employee had no expectancy of continued employment). If plaintiff can show that the relationship was reasonably certain to continue except for the wrongful conduct of defendants, however, she would be entitled to damages beyond 90 days. See Ayres v. AG Processing Inc., 345 F. Supp.2d 1200, 1212 (D. Kan. 2004) (at-will employee can recover for tortious interference if, absent interference, she was reasonably certain of continued employment). Defendants do not address whether, absent their allegedly wrongful conduct, plaintiff's relationship with Nueterra was reasonably certain to continue past 90 days. The Court therefore finds that they are not entitled to summary judgment on this issue.

**IT IS THEREFORE ORDERED** that the Motion For Summary Judgment (Doc. #82) which Ridgewood and Dr. Poggi filed on March 4, 2015 be and hereby is **OVERRULED**.

**IT IS FURTHER ORDERED** that as set out in the pretrial order, the parties shall mediate the claims remaining in this case within 60 calendar days from the date of this Memorandum And Order. See Pretrial Order (Doc. #78) at 11.

Dated this 28th day of June, 2016 at Kansas City, Kansas.

s/ Kathryn H. Vratil
Kathryn H. Vratil
United States District Court

24